Three distinct issues are presented in the instant case, viz.:
(1) The receivers' application for an order directing them to sell an unfinished apartment house of the insolvent corporation free of all liens.
(2) Their application for the advice and direction of the court with reference to the acceptance of bids for same submitted to them.
(3) The mortgagee's application for an order to vacate an order of the court directing the receivers to accept the bid of $250,000 in cash, made to them for said property by Isadore S. Koggan and David J. Koggan.
On January 11th, 1929, the receivers of the Eastside Holding Corporation, an insolvent corporation, filed their duly verified petition praying for an order directing them to sell an unfinished apartment house of the defunct corporation, *Page 487 
whereupon an order was made, returnable on January 21st, 1929, requiring all parties in interest to show cause why such an order should not be made. On the return day, said application was resisted by no one, other than the Fidelity Union Title and Mortgage Guaranty Company, which for convenience sake will hereinafter be referred to as Fidelity and Charles Lask, both of whom held mortgages on the property in question.
The authority of this court in a case such as the instant one to order a sale, free of liens existing against the property at the time of the appointment of the receiver, is found in and conferred by section 81 of the General Corporation act. P.L.1896 p. 303. In construing this statute, court of errors and appeals, in the case of Randolph v. Larned, 12 C.E. Gr. 557, held that the power of this court to order such a sale is dependent upon the existence of the two prerequisites specified in that statute — first, the legality of the prior liens must be brought in question, and secondly, the property must be of a character materially to deteriorate in value pending the litigation. The court in that case further declared that the statute should receive a liberal construction, and that the dispute bringing into question the legality of the liens was not to be limited to an objection to the validity of the mortgage itself, but might exist by reason of disputes touching the extent of the lien created by it, its relative priority to other encumbrances, or other equities raising substantial differences between the parties, the effect of which might lead to extended litigation.
Whenever the existence of these conditions is established, the mischief which the statute is intended to correct is threatened, and the application of the remedy which the statute applies is called for. The principles laid down in Randolph v. Larned,Ibid., are cited with approval in a number of later cases, amongst which are the following: Reilly v. Penn Cordage Co.,58 N.J. Eq. 459, and Bahler v. Robert Treat Baths, 100 N.J. Eq. 525.
An examination of the evidence in the instant case for the purpose of ascertaining whether these two statutory prerequisites *Page 488 
are here present discloses that the receivers in their petition and affidavit state that the legality of all mortgages and lien claims encumbering the property at the time of the appointment of the receivers had been brought in question and that numerous suits at law and in equity were pending relative to the termination of their respective priorities and extent of priorities. This fact was uncontroverted and further established by the answers filed on behalf of Lask and the Fidelity wherein each of them denied the claim of priority over their respective mortgages by the lien claimants and asserted the priority of their respective mortgages over that of the lien claims. The existence of the first of these statutory prerequisites — the bringing in question of the legality of the prior encumbrances — in the case under consideration cannot be questioned and must be conceded in view of such evidence.
With reference to the existence of the second of these statutory prerequisites, the receivers' petition and affidavits state that the plumbing, roofing, heating, electrical, painting, masonry, carpentry and other work as detailed in a lengthy schedule annexed to their petition and embodied in their affidavit, on the building are unfinished. That by reason of holes in the wall of the building, lack of "flashing" or tightening on the roof, around the pent house, scuttles and skylights, and also because of the failure to have "bricked in" or enclosed the pent house, and the neglect to have installed glass in the roof on the skylights and the failure to have repaired the leaks in the roof over the vestibule entrance, the building was exposed to the elements, with the result that the plaster had distintegrated and cracked and the floors had bulged in almost every apartment throughout the building, necessitating all of the repairing of the plaster and the scraping of the floors throughout the building as detailed in the schedule incorporated in the receivers' affidavit.
As against this positive and direct evidence, the Fidelity and Lask produced nothing but their answers, and the affidavits of Harry Jacobs and Max Jacobs. These answers were not verified nor were they even signed by the Fidelity or Lask. They were signed by their respective solicitors only *Page 489 
and without verification, and, therefore, were not evidential of the facts therein alleged. Moreover, these answers did not deny that the building was in the condition stated by the receivers, but merely alleged a want of "knowledge or information sufficient to form a belief on the part of the Fidelity and Lask, respectively, as to the matters contained in those paragraphs of the receivers' petition and affidavit," wherein are specified the respects in which the building was incomplete and deteriorating.
Nor is there any denial in the affidavit of Harry Jacobs of the fact that the building remains uncompleted in the respects specified by the receivers in their affidavit and schedule. The other affidavit, that of Max Jacobs, not only fails to deny that the condition of the building is such as is claimed by the receivers, but it even fails to state or make any reference at all as to what its condition is. He was the person in actual charge of the construction of this building and, therefore, more qualified than all others to have told what its true condition was and to have denied that its condition was such as is stated by the receivers, if such were not the fact. The overwhelming and undisputed evidence in the case before me conclusively establishes that the second of these statutory prerequisites — that the property in question is of a character materially to deteriorate in value pending the litigation — also is present and exists in the case before me. The case of Frank Stripe v.Englewood Building Corporation, wherein an order was made directing the receivers to sell, free of liens, the appeal from which order was affirmed by the court of errors and appeals, presents many features similar to the instant case.
In addition to the two statutory prerequisites there is also present in the instant case the further fact that the receivers are holding and will be compelled to continue holding this building, pending the litigation, at a loss to the estate of more than $2,000 a month. Such is the fact charged by the receivers in their affidavit and permitted to remain unchallenged or uncontradicted by anyone in the case. A loss so great to the estate in the charge of this court should not go *Page 490 
unnoticed by the court, nor be permitted to continue, if possible to prevent. Especially is this all the more true, where, as here, not one of the parties, litigating with the others his respective individual claim to priority, has signified his willingness to indemnify this estate against this huge monthly loss during the period of his or their said litigation.
From all of the evidence in the case before me, I find that the existence of both of the statutory prerequisites have been established and that it will be for the best interest of all creditors if the property be sold free of all liens, pending the litigation, relative to their legality, the liens of such to attach to the proceeds of sale in the same order, priority and extent of priority in which they were affixed to the building, and will so order.
Proceeding now to the second of the issues here involved: On February 18th, 1929, the receivers presented their duly verified petition seeking the advice and direction of this court with reference to a bid of $245,000, in cash, received by them from Simon H. Glass for the property in question. On the same day, an order was made requiring all parties in interest to show cause why the receivers should not be directed to accept the bid for said property. Subsequently two additional offers were presented to the court. One on behalf of Isaac Jacobs in the sum of $245,000 but providing for the payment of only $5,000 in cash and the balance of $240,000 by taking said property subject to and assuming the payment of the Fidelity's mortgage of $240,000 plus an agreement by said offerer to furnish a bond for $50,000 to secure payment to lien claimants establishing their priority over the Fidelity's mortgage only. This offer was for not only the apartment house in question but included all other real and personal property and assets of the insolvent corporation as well, the estimated value of which additional property was at least $100,000. The other offer was submitted on behalf of David S. Koggan and Isadore J. Koggan and was in the sum of $250,000 to be paid in cash, for the apartment house and the land whereon it was erected only. *Page 491 
The acceptance of the offer of Isaac Jacobs was vigorously resisted both by the receivers and the attorneys of all lien claim creditors there represented because it was for the property free of all liens except the mortgage of the Fidelity, it provided for the payment of only $5,000 in cash, didn't provide for the furnishing of a bond with security to be approved by the court, it was greatly less than the other bids since it also embraced other real and personal property of an estimated value of at least $100,000, all of which contentions against and objections to the acceptance of this bid the court finds to be meritorious. The acceptance of the Simon H. Glass offer was objected to because it was conditioned upon the title to the property being insured by the Fidelity and because it was not the best price offered for the property, both of which objections the court finds to be meritorious. And no other offers, other than that on behalf of David S. Koggan and Isadore J. Koggan, having been presented or submitted to the court, I find that the offer of $250,000, in cash, made on behalf of David S. Koggan and Isadore J. Koggan, is the highest and best price obtainable for the property and that the receivers should be directed to accept it and will so order.
This leads to the consideration of the third and last of the issues involved in this case, the Fidelity's application for an order vacating the order directing the receivers to accept the $250,000 bid of the Koggans granting all parties leave to submit new offers for said property.
From the affidavit of its vice-president, John D. Foster, who was the person in charge of this transaction, and the other evidence before the court, it appears that the Fidelity had actual knowledge of the fact that the Koggans intended to submit, and did submit, an offer of $250,000 in cash for the property; that it encouraged them to make said offer by its assurance to loan them $240,000 on this very property in the event of their being the successful bidders, and that in furtherance thereof, it actually received and accepted their signed application for said loan, together with their check for $100 as an application fee, which money it has never returned; *Page 492 
that on February 28th, 1929, the day following the acceptance of their bid, the Koggans left at the office of Vice-President Foster copies of the order directing the receivers to accept their bid of $250,000, and that they subsequently called on numerous occasions upon the Fidelity to make said loan as agreed, until finally on March 8th, 1929, it finally informed them of its inability to pay over said loan until its vice-president, John D. Foster, returned from Florida, which the Koggans refused to do; that the Koggans thereupon at a cost of $10,000 rearranged to finance their bid, and only after all of which the Fidelity, for the first time, gave notice of its intention to have the order directing the acceptance of the Koggans' bid vacated.
Even were it true that the Fidelity was without notice of the Koggans' offer — yet undisputed evidence establishes and the court finds the contrary to be the fact — there is grave doubt whether the Fidelity by reason of its assurances, acts and conduct, resulting in the Koggans submitting their bid, and subsequently incurring an expense of $10,000 for financing it, should not now be held to be equitably estopped from being heard in its attempt to have the order directing the acceptance of said bid vacated.
On the hearing of the said application of the Fidelity there were no additional bids submitted excepting one on behalf of one George Weiner. This offer provided for the purchase of the property in question free of all encumbrances for $250,000, the said bidder, however, only agreeing to pay the receivers the difference between the $250,000 bid and the amount claimed to be due for principal and interest on the Fidelity's mortgage, said bidder also agreed to deliver to the receivers a surety bond, he, however, not specifying the amount of said bond nor what its conditions were to be.
In resisting the acceptance of this offer, it was meritoriously contended that the offer was such, as was "impossible of being accepted or performed by the receivers" because it contemplated the payment to the receivers of merely the difference between the $250,000 offered and the amount claimed to be due for principal and interest on the Fidelity mortgage, *Page 493 
about $248,500, which would be the sum of only $1,500, and that with only this sum of $1,500 in hand, the receivers would be confronted with the impossible task of paying off approximately $4,000 in accrued taxes and assessments and $3,500 for receivers' certificates, which encumbered the property, and all of which would have to be paid off by the receivers in order to deliver title free of taxes, liens, c., as specified in the offer of said George Weiner.
In further resisting the acceptance of this offer, it was argued with great force and merit that inasmuch as it, in effect and substance, was for the property free of all liens excepting that of the Fidelity's mortgage, this court has no right or power to order a sale subject to the lien of the Fidelity's mortgage but free of all others, since the legality of all of the liens, including that of the Fidelity's mortgage, had been brought in question, and that, therefore, this court could only authorize a sale free of all of said liens, as provided for by section 81 of the Corporation act. It was also contended that this court was without power or authority to order the liens of all parties, excepting the Fidelity, to be freed of the property and to attach a mere bond instead of to the fund realized from the sale of the property free of liens, contrary to the express provision of section 81 of the Corporation act.
In addition to the foregoing there were presented the further objections that the George Weiner bid failed to indicate in what amount the proposal was to be or how it was to be conditioned; and that said bid was not even as good as that of the Koggans.
The court is of the opinion that all of the foregoing objections, which were interposed against the acceptance of the George Weiner bid, are both meritorious and well taken, and that the said bid should be rejected, and such is the order of the court.
Inasmuch as the Fidelity has expressed no desire to submit any bid itself, nor to have the court consider any further bids, excepting that of said George Weiner, and no other bids having been submitted, the setting aside or opening of the *Page 494 
order directing the receivers to accept the Koggans' bid will serve no legal or equitable purpose and prove detrimental to the interest of all parties concerned, and the application of the Fidelity to do so is therefore denied.
I think the allowances to the receivers and their solicitors were justified and were reasonable in consideration of their services and the extent and character of the estate.